**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

RAYMOND C. SELKE,  Administrator of the Estate of YVONNE C. SELKE, Deceased, on behalf of the Estate of YVONNE C. SELKE, RAYMOND C. SELKE, Surviving Husband, and TREVOR J. SELKE, Surviving Son,

and

RAYMOND C. SELKE,  Administrator of the Estate of EMILY E. SELKE, Deceased, on behalf of the Estate of EMILY E. SELKE, RAYMOND C. SELKE, Surviving Father, and TREVOR J. SELKE, Surviving Brother,

          Plaintiffs,

v.

GERMANWINGS GMBH, a German corporation; DEUTSCHE LUFTHANSA AG, a German corporation; UNITED AIRLINES, an Illinois corporation; and EUROWINGS GMBH, a German corporation,

          Defendants.

Case No.   **1:17cv121  (GBL/TCB)**

**COMPLAINT FOR DAMAGES FOR:**

**1.  NEGLIGENCE**

**2.  MONTREAL CONVENTION**

**DEMAND FOR JURY TRIAL**

     Plaintiffs RAYMOND C. SELKE, Administrator of the Estate of YVONNE C. SELKE, Deceased, and the Estate of EMILY E. SELKE, Deceased, on behalf of the Estates of YVONNE C. SELKE and EMILY E. SELKE, RAYMOND C. SELKE, Surviving Husband, and TREVOR J. SELKE, Surviving Son (collectively, "Plaintiffs"), through their undersigned attorneys, bring this action against defendants GERMANWINGS GMBH (hereinafter "GERMANWINGS"), DEUTSCHE LUFTHANSA AG (hereinafter "LUFTHANSA"), UNITED AIRLINES (hereinafter "UNITED"), and EUROWINGS GMBH (hereinafter "EUROWINGS") (collectively "DEFENDANTS"), as follows:

**INTRODUCTION**

1.      On March 24, 2015, YVONNE C. SELKE and EMILY C. SELKE, beloved mother and daughter, were on vacation from Virginia and traveling round trip from Washington Dulles International Airport through Barcelona-El Prat Airport in Spain and then to Düsseldorf Airport in Germany onboard Germanwings Flight 9525.  Co-pilot Andreas Lubitz caused the plane to crash in the French Alps, approximately 62 miles northwest of Nice, France.  All 144 passengers and six crew members were killed.

**JURISDICTION**

2.      This Court has jurisdiction under 28 U.S.C. § 1331(a), pursuant to Article 33 of the *Convention for the Unification of Certain Rules for International Carriage by Air*, concluded at Montreal, Canada, on May 28, 1999  ("Montreal Convention"), and all relevant laws applicable thereto, including but not limited to the *Convention for the Unification of Certain Rules Relating to International Carriage by Air*, signed at Warsaw on October 12, 1929 (the "Warsaw Convention"), 49 U.S.C. § 1502 et seq., as amended by the Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, done at The Hague on October 28, 1955 (the "Hague Protocol").

3.      The Montreal Convention has been ratified by both the United States and Germany. As a party to the International Air Carrier Transport Association Intercarrier Agreement on Passenger Liability, which specifically removes limitations on damages, Defendants GERMANWINGS, LUFTHANSA, EUROWINGS, and UNITED are signatories to the Montreal Convention.   Under Article 33 sections (1) and (2) of the Montreal Convention, passengers YVONNE and EMILY SELKE purchased their round trip tickets for the subject flight in Virginia through United Airlines' online ticketing system.

4.      Pursuant to Article 17 of the Montreal Convention, a carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

5.    Pursuant to Article 39 of the Montreal Convention, two classes of carriers are subject to liability, contracting carriers and actual carriers. Defendant, UNITED, was the "contracting carrier" for the entire round trip tickets, including GERMANWINGS Flight No. 1925.  The "contracting carrier" is defined as one who "makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as 'the actual carrier') performs, by virtue of authority from the contracting carrier, the whole or part of the carriage."

6.    Pursuant to Article 33 of the Montreal Convention, jurisdiction is proper in a United States Court as YVONNE and EMILY SELKE's principal and permanent place of residence were in this District at the time of the crash on March 24, 2015.  Accordingly, the Plaintiffs, as American citizens and residents, have the right to pursue their case in this Court under Article 33 of the Montreal Convention.

7.    Jurisdiction over Defendants LUFTHANSA, GERMANWINGS, and EUROWINGS is also proper pursuant to Federal Rule of Civil Procedure, Rule 4(k)(2) because Plaintiffs' claims arise under federal law, Defendants LUFTHANSA, GERMANWINGS, and EUROWINGS each have ample contacts with the United States as a whole, and exercising jurisdiction over Defendants LUFTHANSA, GERMANWINGS, and EUROWINGS, and each of them, is consistent with the United States Constitution and laws.

8.    This Court has jurisdiction under 28 U.S.C. § 1332.  The principal and permanent residences of Plaintiffs are in this District. Defendants GERMANWINGS, LUFTHANSA, and UNITED maintain corporate offices in Germany and in Illinois.  The amount in controversy exceeds the $75,000 jurisdictional minimum of this Court.  The contract of carriage was made in Virginia.  Both the origination and ultimate destination in the contracts of carriage of decedents was Washington Dulles International Airport (hereinafter "IAD" or "DULLES"), located in Virginia.  DEFENDANTS, and each of them, routinely operate services for the carriage of passengers by air through DULLES and other United States' airports, either directly or indirectly through code-sharing agreements or Star Alliance partnerships.  As such, DEFENDANTS, and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

each of them, have sufficient minimum contacts necessary to subject them to personal jurisdiction in this Court.  In addition, DEFENDANTS maintain places of business and conduct business in Virginia.

9.      Jurisdiction over DEFENDANTS, and each of them, is also proper pursuant to Federal Rule of Civil Procedure, Rule 4(k)(1) because each DEFENDANT is subject to the jurisdiction of a court of general jurisdiction in the State of Virginia.

10.     At all times relevant, Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS, and each of them, were in an agency relationship with Defendant UNITED. Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS, and each of them, purposefully availed themselves of a Virginia forum by directing their actual or apparent agent, UNITED, subject to their control and for their benefit, to take action in Virginia by selling airplane tickets for GERMANWINGS, LUFTHANSA, and EUROWINGS' flights pursuant to various agreements, including but not limited to, code-sharing agreements or Star Alliance partnerships. Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS, and each of them, represented or held out UNITED to Plaintiffs as each of their agent and induced reliance by Plaintiffs on the appearance of agency.

11.     At all times relevant, DEFENDANTS, and each of them, were, pursuant to various agreements to sell each other's airplane tickets, including but not limited to code-sharing agreements or Star Alliance partnerships, in a partnership, joint venture, joint adventure, or joint enterprise because they combined in a joint business enterprise and community of interest for their mutual benefit, with an express or implied understanding or agreement that they were to share in the profits or losses of the enterprise, and that each of them was to have a voice in its control or management.  DEFENDANTS, and each of them, substantially collaborated with forum residents and engaged in substantial activity in Virginia in furtherance of their partnership, joint venture, joint adventure, or joint enterprise.  As a result, the minimum contacts of each partner, co-venturer, co-adventurer, or co-enterpriser in Virginia are attributable to the other partners, co-venturers, co-

adventurers, or co-enterprisers such that personal jurisdiction over one DEFENDANT means personal jurisdiction over each of the other DEFENDANTS.

## VENUE

12.     Venue in the Eastern District of Virginia is proper pursuant to 28 U.S.C. § 1391 and Local Civil Rule 3 because a substantial portion of the events and omissions giving rise to the claims alleged herein occurred in this District.  Further, Plaintiffs' principal and permanent places of residence are in this District, and DEFENDANTS maintain business contacts and commerce in Virginia sufficient for personal jurisdiction.

## PARTIES

13.     Plaintiff RAYMOND C. SELKE is the duly appointed Administrator of the Estate YVONNE C. SELKE and Administrator of the Estate of EMILY E. SELKE.  He is the surviving spouse of YVONNE C. SELKE and the surviving father of EMILY E. SELKE.  At all times mentioned herein, RAYMOND SELKE, YVONNE C. SELKE and EMILY E. SELKE were residents and citizens of the State of Virginia, and United States citizens.

14.     Plaintiff TREVOR J. SELKE is the surviving son of YVONNE C. SELKE and the surviving brother of EMILY E. SELKE.  At all times mentioned herein, TREVOR J. SELKE was a resident and citizen of the State of Virginia, and a United States citizen.

15.     Defendant UNITED AIRLINES is incorporated in the State of Delaware and registered to conduct business in the Commonwealth of Virginia.  UNITED routinely engages in continuous and systematic business in this District.  UNITED's principal place of business is in Illinois.

16.     UNITED is a domestic and international airline.  It is the largest airline (passengers serviced) at Washington Dulles International Airport.

17.     Defendant DEUTSCHE LUFTHANSA AG is a German airline that routinely engages in continuous and systematic business in this District, including regularly scheduled flights to and from DULLES, maintains an office in this District, and is headquartered in Germany.

18.     LUFTHANSA is an international airline.  It is approximately the seventh largest airline (passengers serviced) at Washington Dulles International Airport.

19.     According to LUFTHANSA's website, LUFTHANSA maintains offices across the United States, including at DULLES at P.O. Box 177703, Dulles, Virginia 20166 and 1 Saarinen Circle, Dulles, Virginia 20166 (http://www.lufthansa.com/us/en/Lufthansa-airport-offices.)  Due to its operations out of multiple international airports across the United States, LUFTHANSA has ample contacts with the United States as a whole.

20.     Defendant GERMANWINGS GMBH is a German airline that routinely engages in continuous and systematic business in this District as well as many other United States districts, has ample contacts with the United States as a whole, and is headquartered in Germany.  At all relevant times herein, GERMANWINGS was a wholly owned subsidiary of LUFTHANSA.

21.     Defendant EUROWINGS GMBH is a German airline that routinely engages in continuous and systematic business in this District as well as many other United States districts, and is headquartered in Germany.

22.     Since the date of the crash, March 24, 2015, GERMANWINGS has merged with EUROWINGS, and the combined airline is now being operated as EUROWINGS.  EUROWINGS is a successor corporation to GERMANWINGS.  There is an implied and/or express agreement between EUROWINGS and GERMANWINGS that EUROWINGS has assumed all of the obligations and assets of GERMANWINGS.   The purchase of GERMANWINGS by EUROWINGS was a de facto consolidation or merger.  EUROWINGS is a mere continuation of GERMANWINGS.

23.     At all relevant times herein, EUROWINGS was and is a wholly owned subsidiary of LUFTHANSA.  EUROWINGS also currently offers flights to and from airports in the United States including but not limited to the cities of Las Vegas, NV, Miami and Orlando, FL, and Seattle, WA. (https://www.eurowings.com/en/information/destinations.html.)  Due to its operations out of multiple international airports across the United States, EUROWINGS has ample contacts with the United States as a whole.

24.     UNITED, LUFTHANSA and GERMANWINGS entered into the contracts of carriage with YVONNE and EMILY SELKE and, at all material times, were in control of, and responsible for, their safe round trip transport to and from DULLES, including the leg from Barcelona, Spain to Dusseldorf Germany onboard GERMANWINGS Flight 9525 on March 24, 2015.

25.     LUFTHANSA wholly owned GERMANWINGS at the time of the crash, and was responsible for all operations performed by GERMANWINGS, including the crash of GERMANWINGS Flight 9525.

26.     At all times herein mentioned, Defendants, and each of them, and their aggregates, corporates, associates, and partners, and each of them, were the agent, apparent agent, servant, employee, assignee, permissive user, successor in interest, joint enterpriser, joint adventurer, or joint venturer or enterpriser of each other, and were acting within the time, purpose or scope of such agency, apparent agency, or employment or permission; and all acts or omissions alleged herein of each such Defendant were authorized, consented to, adopted, approved, or ratified by each of the other Defendants.

27.     At all times herein mentioned, defendants, and each of them, and their aggregates, corporates, associates, and partners, and each of them, were the agent, apparent agent, servant, employee, assignee, permissive user, successor in interest, joint enterpriser, joint adventurer, or joint venturer of each other, and were acting within the time, purpose or scope of such agency, apparent agency, or employment or permission; and all acts or omissions alleged herein of each such defendant were authorized, consented to, adopted, approved, or ratified by each of the other defendants.

## FACTUAL BACKGROUND

28.     At all relevant times herein, UNITED was bound by a contractual codeshare agreement with LUFTHANSA and its subsidiary GERMANWINGS, which allows UNITED to sell tickets for travel on flights operated by LUFTHANSA and GERMANWINGS.   Similar

contractual agreements existed, at all times herein relevant, by and between UNITED, LUFTHANSA, and EUROWINGS.

29.    Rule 18 of UNITED's Contract of Carriage states:  "For Codeshare services on flights operated by another carrier, [UNITED] is responsible for the entirety of the codeshare journey for all obligations to PASSENGERS established in these rules."

30.    Rule 28 of UNITED's Contract of Carriage states: "For the purposes of international carriage governed by the Montreal Convention, the liability rules set out in the Montreal Convention are fully incorporated by reference herein and shall supersede and prevail over any provision of this tariff which may be inconsistent with those rules."

31.    On or about July 15, 2014, UNITED and GERMANWINGS filed a Joint Application to the United States Department of Transportation for expedited authorization of "UNITED to provide codeshare services on flights operated by GERMANWINGS…as UNITED has been allowed to do so with its other codeshare partners."

32.    The Joint Application stated, among other things:

1.    GERMANWINGS and UNITED have recently concluded an agreement providing for the display of UNITED's "UA*" designator code on GERMANWINGS-operated flights.  GERMANWINGS, a wholly-owned subsidiary of LUFTHANSA, is a flag carrier of Germany…

2.    GERMANWINGS requests that the Department grant it an exemption and blanket statement authorization to conduct codeshare operations with UNITED pursuant to their codeshare agreement providing for the display of the UNITED's "UA*" designator code on GERMANWINGS' flights in conjunction with foreign air transportation of persons…

33.     Shortly thereafter, the Department of Transportation granted the Joint Application and GERMANWINGS was authorized to conduct flights booked through UNITED, with a UNITED designator code on GERMANWINGS-operated flights.

34.     UNITED and LUFTHANSA have been long time codeshare partners, since at least the year 2000.

35.     At all relevant times herein, UNITED and LUFTHANSA were members of the Star Alliance, which, according to its description, consists of "28 Airlines Working in Harmony."  The Star Alliance website (see screen capture below) states the following:



Our member airlines include many of the world's top aviation companies as well as smaller regional airlines.  Together, they offer easy connections to almost any destination in the world.

Each airline maintains its own individual style and cultural identity, bringing the richness of diversity and multiculturalism to the

alliance.  At the same time each airline shares a common dedication

to the highest standards of safety and customer service.

36.     LUFTHANSA wholly owned GERMANWINGS at and before the time of the crash, and was responsible for, and directed all, operations performed by GERMANWINGS, including the crash of GERMANWINGS Flight 9525.

37.     At all times herein mentioned, UNITED, LUFTHANSA, GERMANWINGS, and EUROWINGS, and each of them, were commercial air carriers engaged in the business of transporting fare-paying passengers on regularly scheduled international flights in aircrafts owned, leased, operated, managed, maintained and/or controlled, either directly or by virtue of codesharing agreements or partnerships and/or joint ventures, by each other.

38.     As   common-carriers,   UNITED,   LUFTHANSA,   GERMANWINGS,   and EUROWINGS were obliged to provide the highest degree of care to its passengers.

39.     YVONNE and EMILY SELKE were vacationing together through Europe, from Virginia, on March 24, 2015.

40.     On or about February 2015, while in Virginia, YVONNE had purchased airline tickets, for herself and her daughter, EMILY, for their European vacation through UNITED, via UNITED's online booking system (www.united.com).

41.     The UNITED itinerary provided the following:

| March 20, 2015 | Washington Dulles, DC (IAD) to Munich, Germany (MUC) |
| | Munich, Germany (MUC) to Barcelona, Spain (BCN) |
| March 24, 2015 | Barcelona, Spain (BCN) to Dusseldorf, Germany (DUS)[1] |
| | Dusseldorf, Germany (DUS) to Manchester, England (MAN) |
| March 29, 2015 | Manchester, England (MAN) to Washington Dulles, DC (IAD) |

---

[1] GERMANWINGS Flight 9525

42. UNITED has a loyalty membership program in place called United Mileage Plus, which provides incentives for its fare paying passengers to continuously book through UNITED even though some legs of the trip include flights that are not operated by UNITED planes, but are rather operated by Star Alliance member planes and their subsidiaries, allowing UNITED to reap an economic benefit it otherwise would not have.

43. At all times relevant herein, YVONNE and EMILY SELKE were UNITED Mileage Plus members and had purchased their airline tickets for this itinerary, which included GERMANWINGS Flight 9525, through the UNITED website and as members of the UNITED loyalty membership program United Mileage Plus.

44. On March 24, 2015, YVONNE and EMILY SELKE boarded GERMANWINGS Flight 9525, an Airbus A320-211, registration number D-AIPX, from Barcelona, Spain (BCN) to Dusseldorf, Germany (DUS).



45. At all times herein mentioned, Flight 9525 was under the exclusive control of DEFENDANTS, and of each of them, and each of their agents, servants and employees.

46. At all times herein mentioned, DEFENDANTS, and of each of them, so negligently, carelessly and recklessly owned, operated, maintained and controlled Flight 9525 so as to cause it to crash into the French Alps, killing all onboard, including EMILY and YVONNE SELKE.

47.     Flight 9525 was scheduled to take off at 9:35 a.m. Central European Time (CET) but was delayed until 10:01 a.m. CET, with new scheduled arrival time of 11:39 a.m. CET.[2]

48.     Flight 9525 reached its cruising altitude of 38,000 feet approximately 26 minutes after takeoff (10:27 a.m. CET), while over the Mediterranean Sea.



49.     At 10:30:24 the selected altitude on the airplane's onboard computer changed in one second from 38,000 ft to 100 ft. One second later, the autopilot changed to "Open Des" mode and auto thrust changed to "THR IDLE" mode. The plane began to drastically descend and both engines' rpm decreased.

50.     At 10:33:12, the speed management changed from "Managed" mode to "Selected" mode, allowing the pilot flying to select target speed. One second later, the target speed became 308 kt while the airplane speed was 273 kt.

51.     The airplane's speed began to horrifyingly increase along with the airplane's descent rate, which varied between 1,700 ft/min and 5,000 ft/min, then averaged approximately 3,500 ft/min.

---

[2] All times in Central European Time (CET) unless otherwise stated.

52.     At 10:33:47, the controller asked the flight crew what cruise level they were cleared for. The airplane was at an altitude of 30,000 ft in descent. There was no answer from the pilot flying. The controller further attempted to contact the flight crew on two additional occasions, without a response.

53.     At 10:34:23, the selected speed increased to 323 kt. At this time the airplane speed was 301 kt and began to increase toward the new target speed during a rapid descent.  At 10:34:31 the buzzer to request access to the cockpit was recorded; and at 10:34:38, the controller once again attempted to contact the flight crew, with no answer.

54.     At 10:34:47 the Marseille control center tried to contact the flight crew, without an answer while the plane was now at an altitude of 25,100 ft, in descent. The selected speed was then drastically increased to 350 kt.

55.     On information and belief, the passengers onboard were terrified. The cockpit signal from the cabin interphone was recorded on four occasions. Noises similar to a person knocking on the cockpit door were recorded on six occasions. Muffled voices shouting for the door to be opened were heard several times.

56.     On information and belief, the captain of the flight had exited Flight 9525's cockpit, leaving the co-pilot as the sole occupant.

57.     On information and belief, the co-pilot locked the cockpit door from the inside, thus denying the captain reentry; the co-pilot then became the sole pilot with the ability to manipulate the flight controls of Flight 9525.

58.     The Marseille control center, and the French Air Defense system attempted to contact the flight crew, with no answer.  Noises similar to violent blows on the cockpit door were recorded on five occasions.  Low altitude inputs on the co-pilot's sidestick were recorded. The flight crew of another airplane also tried to contact the flight crew, with no answer.

59.     As the plane approached the mountains, the "Terrain, Terrain, Pull Up, Pull Up" aural warning from the GPWS triggered and remained active.  The Master Caution warning was recorded and remained active until the end of the flight.

60.     All 144 passengers and six crew members were killed.

61.     On March 24, 2015, Defendants GERMANWINGS and LUFTHANSA announced the incident out of which this case arises was an "accident" and further stated: "We must confirm to our deepest regret that Germanwings flight 4U 9525 from Barcelona to Dusseldorf has suffered an accident over the French Alps. The flight was being operated with an Airbus A320 aircraft, and was carrying 144 passengers and six crew members. Lufthansa and Germanwings have established a telephone hotline. The toll-free 0800 11 33 55 77 number is available to all the families of the passengers involved for care and assistance. Everyone at Germanwings and Lufthansa is deeply shocked and saddened by these events. Our thoughts and prayers are with the families and friends of the passengers and crew members."

(https://web.archive.org/web/20150324141742/https://www.germanwings.com/pre_info.html)



62.     After the crash of GERMANWINGS Flight 9525, GERMANWINGS and other European airlines implemented a safety policy that required at least two crew members to remain

in the cockpit of its aircraft at all times, in order to prevent the known danger of allowing one crew member to occupy the cockpit.

63.    This safety policy had long been implemented in the United States concerning its domestic carries, including UNITED, precisely to prevent this well-known danger of having one crew member in the cockpit. However, that policy was not shared by UNITED with its Star Alliance partners and their subsidiaries despite the fact that each of the Star Alliance member airlines, as advertised to passengers in the United States, including EMILY and YVONNE SELKE, "share a common dedication to the highest standards of safety and customer service."

64.    Defendants', and each of their, acts, omissions and failures constituted gross, wanton, and willful disregard for the rights and safety of all passengers aboard GERMANWINGS Flight 9525 and needlessly caused physical and mental injuries, damages, and deaths to innocent passengers, including Plaintiffs' decedents herein.

65.    As a direct and proximate result of the conduct, acts, omissions and failures of Defendants, and each of them, both EMILY SELKE and YVONNE SELKE sustained injuries which resulted in their deaths, and their beneficiaries, heirs and survivors have incurred funeral, burial, travel and related expenditures, in addition to the loss of their personal property, including but not limited to luggage and carry on items and the personal effects contained therein, in an amount to be determined according to proof at the time of trial.

66.    As a direct and proximate result of the conduct, acts, omissions and failures of Defendants, and each of them, both EMILY SELKE and YVONNE SELKE died, and their beneficiaries, including without limitation, RAYMOND C. SELKE and TREVOR J. SELKE, have been damaged and will continue to be deprived of their future services, companionship, guidance, love, increased inheritance and support, and have sustained and will continue to sustain other economic and pecuniary losses, non-pecuniary losses as well as other compensable / available damages under applicable law.

67.    Plaintiffs, and each of them, have suffered, and continue to suffer, from economic losses and in addition, Plaintiffs' decedents suffered mental and emotional injuries, coupled with

and arising out of physical injuries, sustained during the minutes and moments before the crash, all to their general damages in an amount in excess of the minimum jurisdiction of the court to be proven at the time of trial.

68.     As a direct and proximate result of the acts, omissions and failures of defendants, and each of them, Plaintiffs have suffered loss of income, and / or a loss of earning capacity in an amount to be determined according to proof at the time of trial.

69.     As a further direct and proximate result of the acts, omissions and failures of defendants, and each of them, Plaintiffs have suffered the loss of their personal property, including but not limited to luggage and carry on items and the personal effects contained therein, in an amount to be determined according to proof at the time of trial.

### FIRST CLAIM FOR RELIEF

### NEGLIGENCE

### (Against All Defendants)

70.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth herein.

71.     At all times relevant, Defendants, and each of them, were common carriers engaged in the business of providing air transportation for fare-paying passengers on international flights either to and from the United States or between other countries.

72.     At all times relevant, Defendant airlines, and each of them, had agreements in place whereby passengers residing in the United States, including EMILY and YVONNE SELKE, would be able to purchase tickets on their flights through companies located in the United States.

73.     Defendant airlines, and each of them, were, at all relevant times herein, part of the Star Alliance of airlines, which, among other things, allowed United States residents, including EMILY and YVONNE SELKE, to contract for and purchase international flights and itineraries through Defendant UNITED's website (*www.united.com*).  The Star Alliance promotes its member airlines as "shar[ing] a common dedication to the highest standards of safety and customer service."

74.     EMILY and YVONNE SELKE purchased their tickets through the UNITED website, which included GERMANWINGS Flight 9525 on the itinerary, a wholly owned subsidiary of and controlled and managed by Star Alliance member LUFTHANSA, as members of UNITED's loyalty program United Mileage Plus.

75.     As common carriers that take revenue from passengers in the United States and promote themselves as having the highest levels of safety to United States residents, Defendants, and each of them, owed the passengers of GERMANWINGS Flight 9525, including EMILY and YVONNE SELKE, a duty of utmost care and the vigilance for the safe transport of passengers.

76.     Pursuant to Part 121 of the Federal Aviation Regulations [14 C.F.R. 121.1 et seq.], Defendants held an Air Carrier Operating Certificate that authorized them to serve as common carriers in air transportation in the United States.  As such, Defendants, and each of them, owed a duty of care to its passengers, including YVONNE and EMILY SELKE, consistent with the requirement that it maintain and operate its aircraft in the safest manner possible.

77.     Defendants', and each of them, common law duty also required them to maintain and operate its aircraft, including the GERMANWINGS Flight 9525 aircraft, to the highest degree of safety and care.

78.     At all times herein Defendants, and each of them, negligently, carelessly, and recklessly, breached their duty of care to passengers of GERMANWINGS Flight 9525, including EMILY and YVONNE SELKE, by failing to safely maintain, operate, maneuver, handle, control, equip, manage and/or pilot Flight 9525 and/or failing to properly and safely train, teach, educate, prepare, inform, alert, monitor, guide or tutor its pilots, crew and other personnel to operate a passenger aircraft and by failing to have known policies in place that would have timely and safely responded to or prevented emergency situations, including but not limited to the one experienced by GERMANWINGS Flight 9525, an unattended sole crew member in the cockpit.

79.     As a direct and proximate result of DEFENDANTS', and each of their, acts and omissions, including gross negligence and recklessness of the airlines for, among other things, their failure to have a known safety policy in place to prevent lone crew members in the cockpit, flight

crew on Flight 9525 and the inadequate training and supervision Defendants provided to said crew, which caused the GERMANWINGS Crash, Plaintiffs were seriously injured and damaged as alleged herein and will continue to suffer from their physical, mental, and economic injuries for the foreseeable future.

80.     At all times relevant, Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS were in an agency relationship with Defendant UNITED.   Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS purposefully availed themselves of a Virginia forum by directing their actual or apparent agent, UNITED, subject to their control and for their benefit, to take action in Virginia by selling plane tickets for GERMANWINGS, LUFTHANSA, and EUROWINGS' flights pursuant to various agreements, including but not limited to code-sharing agreements and / or Star Alliance partnerships.   Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS represented or held out UNITED to Plaintiffs as their agent and induced reliance by Plaintiffs on the appearance of agency.

81.     At all times relevant, DEFENDANTS were, pursuant to various agreements to sell each other's plane tickets, including but not limited to code-sharing agreements or Star Alliance partnerships, in a partnership, joint venture, joint adventure, or joint enterprise because they combined in a joint business enterprise and community of interest for their mutual benefit, with an express or implied understanding or agreement that they were to share in the profits or losses of the enterprise, and that each of them was to have a voice in its control or management.  DEFENDANTS substantially collaborated with forum residents and engaged in substantial activity in Virginia in furtherance of their partnership, joint venture, joint adventure, or joint enterprise.  As a result, the minimum contacts of each partner, co-venturer, co-adventurer, or co-enterpriser in Virginia are attributable to the other partners, co-venturers, co-adventurers, or co-enterprisers such that personal jurisdiction over one DEFENDANT means personal jurisdiction over all DEFENDANTS.

82.     As a direct and proximate result of the acts, omissions and failures of defendants, and each of them, Plaintiffs have sustained damages as fully set forth and described herein.

### SECOND CLAIM FOR RELIEF

### MONTREAL CONVENTION

### (Against All Defendants)

83.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth herein.

84.     On November 4, 2003, the United States signed, ratified and adopted as law the Montreal Convention, a multilateral international treaty which supplies rules governing international carriage by air.  Because the transportation provided to EMILY and YVONNE SELKE was between points in two different nations and because both these nations are signatories to the Montreal Convention, the transportation was international carriage as defined by Article 1(2) of the Convention, and the Convention is therefore applicable to this action pursuant to Article 1(1).

85.     Pursuant to Article 17 of the Montreal Convention, the carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

86.     The injuries and resulting death that EMILY and YVONNE SELKE suffered took place on board GERMANWINGS Flight 9525.

87.     The GERMANWINGS Crash on March 24, 2015 was an "accident" within the meaning of Article 17(1) of the Montreal Convention.  Defendants GERMANWINGS and LUFTHANSA have declared it as such, as described herein.

88.     Pursuant to Article 17 of the Montreal Convention, Defendants, and each of them, are liable for damages sustained by passengers aboard GERMANWINGS Flight 9525, as said injuries and damages occurred while they were on board the doomed aircraft.

89.     At all times herein Defendants, and each of them, negligently, carelessly, and recklessly, breached their duty of care to passengers of GERMANWINGS Flight 9525, including EMILY and YVONNE SELKE, by failing to safely maintain, operate, maneuver, handle, control, equip, manage and/or pilot Flight 9525 and/or failing to properly and safely train, teach, educate,

prepare, inform, alert, monitor, guide or tutor its pilots, crew and other personnel to operate a passenger aircraft and by failing to have known policies in place that would have timely and safely responded to or prevented emergency situations, including the one experienced by GERMANWINGS Flight 9525, an unattended sole crew member in the cockpit.

90.     Defendants', and each of their, liability under the Montreal Convention is absolute up to 113,100 Special Drawing Rights (SDR) pursuant to Article 21(1).

91.     Defendants, and each of them, are further liable to Plaintiffs under Article 21(2) of the Montreal Convention for all personal injury and death damages exceeding 113,100 SDR unless it proves that (a) Plaintiffs' injuries were not due to the negligence or other wrongful act or omission of Defendant airlines or its servants or agents; or (b) the injuries were solely due to the negligence or other wrongful act or omission of a third party.

92.     The GERMANWINGS Crash occurred due to the negligence, wrongful acts and omissions of Defendant airlines herein, and their servants and agents, and each of them, and not due to the sole negligence or other wrongful act or omission of any third party.

93.     At all times relevant, Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS were in an agency relationship with Defendant UNITED.   Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS purposefully availed themselves of a Virginia forum by directing their actual or apparent agent, UNITED, subject to their control and for their benefit, to take action in Virginia by selling plane tickets for GERMANWINGS, LUFTHANSA, and EUROWINGS' flights pursuant to various agreements, including but not limited to code-sharing agreements or Star Alliance partnerships.   Defendants GERMANWINGS, LUFTHANSA, and EUROWINGS represented or held out UNITED to Plaintiffs as their agent and induced reliance by Plaintiffs on the appearance of agency.

94.     At all times relevant, DEFENDANTS were, pursuant to various agreements to sell each other's plane tickets, including but not limited to code-sharing agreements or Star Alliance partnerships, in a partnership, joint venture, joint adventure, or joint enterprise because they combined in a joint business enterprise and community of interest for their mutual benefit, with an

express or implied understanding or agreement that they were to share in the profits or losses of the enterprise, and that each of them was to have a voice in its control or management. DEFENDANTS substantially collaborated with forum residents and engaged in substantial activity in Virginia in furtherance of their partnership, joint venture, joint adventure, or joint enterprise. As a result, the minimum contacts of each partner, co-venturer, co-adventurer, or co-enterpriser in Virginia are attributable to the other partners, co-venturers, co-adventurers, or co-enterprisers such that personal jurisdiction over one DEFENDANT means personal jurisdiction over all DEFENDANTS.

95. As a direct and proximate result of the aforesaid crash, EMILY and YVONNE SELKE sustained injuries which resulted in their death.

96. As a direct and proximate result of the aforesaid crash, damages resulted to Plaintiffs herein, to each of the Estates of YVONNE and EMILY SELKE, to RAYMOND C. SELKE and TREVOR J. SELKE, and to all other beneficiaries, survivors and heirs under applicable law, and caused pre-impact terror, pain, suffering, injuries and death to EMILY AND YVONNE. As a result, the distributes and loving survivors of EMILY and YVONNE SELKE have suffered a loss of the pecuniary benefits and non-pecuniary benefits they had a reasonable right to expect had EMAILY and YVONNE survived, including but not limited to the loss of society, consortium, companionship, services, support, grief and sorrow, as well as possible inheritance and any other damages under the Montreal Convention or other applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, and each of them, pray for judgment for each Plaintiff against Defendants, and each of them, as follows:

A. All available damages for wrongful death for the pecuniary losses, non-pecuniary losses, and all other available damages suffered and to be suffered by RAYMOND C. SELKE and TREVOR J. SELKE for the deaths of EMILY SELKE and YVONNE SELKE, and all other beneficiaries, survivors and heirs at law in an amount to be determined by a jury;

B.  All available damages for the injuries and losses sustained by EMILY SELKE and YVONNE SELKE before they died;

C.  Funeral expenses arising from the deaths of EMILY SELKE and YVONNE SELKE;

D.  Damages arising from pre-impact pain and suffering, mental terror and mental anguish of EMILY SELKE and YVONNE SELKE, both deceased;

E.  Any and all economic and non-economic and compensatory damages available under the Montreal Convention or any other applicable law;

F.  Costs and disbursements;

G.  That all issues of fact in this matter be determined by a jury; and

H.  Any such other relief as the Court deems proper.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims for which a jury trial is available pursuant to Federal Rules of Civil Procedure Sections 38(a) and (b).

1   Dated: January 30, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**MILLER DELLAFERA, PLC**

By:_____
          Peter A. Miller, Esq.

Peter A. Miller, Esq. (Virginia Bar No. 47822)
*pmiller@millerdellafera.com*
MILLER DELLAFERA, PLC
175 S. Pantops Drive, Suite 301
Charlottesville, Virginia 22911
Tel: (434) 529-6909
Fax: (888) 830-1488

**BAUM HEDLUND ARISTEI & GOLDMAN PC**
Ronald L.M. Goldman, Esq. (California Bar No. 33422)
*rgoldman@baumhedlundlaw.com*
*[Pro-hac vice pending]*
A. Ilyas Akbari, Esq. (California Bar No. 228051)
*iakbari@baumhedlundlaw.com*
*[Pro-hac vice pending]*
Diane Marger Moore, Esq. (Virginia Bar. No. 88879)
*dmargermoore@baumhedlundlaw.com*
BAUM HEDLUND ARISTEI & GOLDMAN, PC
12100 Wilshire Boulevard., Suite 950
Los Angeles, California  90025-7114
Telephone:  (310) 207-3233
Facsimile:  (310) 207-4204

*Attorneys for Plaintiffs*